## Case No. 17,762.

### The WILLIE G.

[1 Hask. 253;[1] 11 Int. Rev. Rec. 117.]

District Court, D. Maine. Feb., 1870.

VIOLATION OF REVENUE LAWS — IMPORTATION OF LIQUOR—FORFEITURE OF VESSEL—FISHING LICENSE.

1. Whether the importation of more than thirty gallons of distilled spirits in bottles, contained in a cask, is an importation in packages containing less than thirty gallons under the act of July 13, 1866 [14 Stat. 98], quære.

2. A vessel, sailing under a fishing license, may touch at a foreign port and procure supplies, without incurring forfeiture under the acts of congress.

3. Taking on board in a foreign port and bringing into this country two barrels without hire or reward, but as a favor to a friend, supposed to contain crockery, but really containing liquors, is not engaging in trade within the meaning of § 32 of the act of Feb. 18, 1793 [1 Stat. 316], and does not subject the vessel and cargo to forfeiture.

In admiralty. Libel in rem by the United States, claiming a forfeiture of the schooner Willie G. and cargo, for a violation of the revenue laws: (1) Because she brought into this country distilled spirits in packages containing less than thirty gallons. (2) Because goods of the value of $400 were unladed from her not in open day, and without a permit. (3) Because whilst under a license for the fisheries, she engaged in another trade or employment by importing goods into the United States. William Decker made claim to the vessel and cargo, and answered, denying the allegations of the libel.

George F. Talbot, U. S. Dist. Atty.

Wales Hubbard and Josiah H. Drummond, for claimant.

FOX, District Judge. This schooner was seized, with her fishing outfits on board, in the harbor of Portland on the 23d day of April last by the collector of the port, for certain alleged violations of the revenue laws in Oct., 1867.

There is some conflict of testimony, but the following facts are proved to my satisfaction, viz.: The vessel in 1867 was, and still is, the property of the claimant, Wm. Decker of Southport, in this district. She was licensed for the fisheries, without any permit to touch and trade at a foreign port or place. Having taken her fare in the Gulf, on her homeward voyage she touched at Pirate Cove, in the Straits of Canso, for wood and water, and for no other object. Whilst engaged in getting these articles on board, an acquaintance of the skipper requested

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

him to take on board a couple of barrels of crockery for John Topham, a sailmaker, residing at Wiscasset,.who was well known to the skipper. He at first demurred, but on being again applied to and informed that the barrels were on the wharf all ready to be put into the boat, consented, and they were received on board and brought in the schooner to Southport, and there landed in open day. One of the barrels was taken away by Topham, the other remained some time in Decker's storehouse and was afterwards given by Topham to Decker. It contained twenty to thirty bottles of gin, packed in bran. The barrels were marked "John Topham, Wiscasset, crockery." The skipper was not aware of their contents, and he received them as a favor for the party, without accepting or expecting any compensation for what he did. Decker did not know that the barrels were brought in the vessel until they were landed, and never claimed any freight therefor.

The libel contains three counts. The first, charges this vessel with having brought into this district a quantity of distilled spirits, in casks or packages of a less capacity than thirty gallons. By the act of the 13th of July, 1866, in force at the time this vessel arrived, "brandy and other spirituous liquors may be imported in casks or other packages, not less than thirty gallons." In the present case the liquor, gin, was in bottles, packed in barrels, which, it is admitted, were of a capacity of more than thirty gallons.

I certainly entertain some doubt as to the true construction of this act, and have reason to know that some of my judicial brethren share with me in the doubt, which is, whether it was the intention of congress, that distilled spirits should not be imported in less quantities than thirty gallons, or whether a less quantity may be imported, provided its exterior cask or covering would have contained thirty gallons. It does not become necessary for me to determine what is the true construction of this provision, as the treasury department, by a letter of the assistant secretary, under date of June 20, 1867. to be found in Internal Revenue Record, 1867 (volume 6, page 3), has declared: "That any quantity of spirituous liquors may be imported in packages, the outside envelope or covering of each of which is of sufficient capacity to contain not less than thirty gallons."

Upon being advised that such had been the construction given by the department to the law, and such construction not appearing to have been in any respect subsequently altered or modified, the first count in the libel was very properly abandoned and withdrawn by the district attorney, as it would be the grossest injustice for the government to claim a condemnation for an importation which had been previously authorized by the secretary of the treasury and by his sanction communicated in the most public manner to all persons interested in navigation, and which is not known or understood to have been revoked or modified.

Before passing to the other counts, I would suggest, that the act of 1790 prohibited the importation of distilled spirits in packages less than ninety gallons, under forfeiture of the liquors and the vessel in which they were imported. [1 Stat. 145.] The act of 1866 authorizes the importation of spirits in packages not less than thirty gallons, under a penalty of a forfeiture of the liquors if imported in smaller packages, and this is the only penalty specified in the act. The act of 1790 is not in terms expressly repealed, but the provisions of the act of 1866 are to some extent inconsistent with it, authorizing much smaller packages, and declaring as a penalty the forfeiture of the liquors, if imported in packages less than those allowed. Congress having thus stated in distinct terms what shall be the penalty if distilled liquors are imported in lesser packages, when the question is fairly presented, it will require very careful examination and consideration to decide whether a vessel thus importing liquors in the prohibited packages, is therefor any longer liable to forfeiture; if the double forfeiture of both liquors and the vessel bringing them, provided for by the act of 1790, still remains, there seems to have been no necessity for expressly enacting in the act of 1866 that one of them shall continue; from this provision, it would rather be inferred that it was the intention of congress that there should be but a single forfeiture, that of the liquors thus illegally imported; the point does not here arise for decision, but I have made these suggestions that it may not be understood that it has entirely escaped the attention of the court.

The second count charges an unlading of goods of the value of four hundred dollars, not in open day, without a permit. This count cannot be sustained. The goods were unladen between 8 and 10 a. m., and were not of the value of four hundred dollars.

The real contest in the cause arises upon the third count, which charges this vessel whilst under license for the fisheries, with being employed in another trade, viz: importing goods into the United States, from a foreign port or place, whereby the vessel and cargo found on board at the time of her seizure are forfeited. This claim is under the 32d sec. of act of 28th Feb., 1793, by which it was enacted "that if any licensed ship or vessel shall be employed in any other trade than that for which she is licensed, every such ship or vessel, with her tackle, apparel, and furniture, and the cargo found on board of her, shall be forfeited." In the case of The Two Friends [Case No. 14,289], Judge Story decided, that the cargo found on board at the time of the seizure shall be forfeited, not merely that

which was on board at the time of committing the offence. In some cases, this construction of the law might prove detrimental to the public interest, as it holds out an inducement to officers not to seize the vessel at the time the forfeiture is incurred if the cargo then on board is but of little value, but the rather to postpone proceedings until she is found laden with a valuable cargo, belonging to her master or owners, and in the meantime, the vessel may be lost, or never return within reach of process, or the testimony against her vanish away, and thereby the government lose what it might have otherwise secured. In the present case, the seizure was made in April last, whilst the illegal importation was in Oct., 1867. During this period, the vessel had been engaged in fishing, and at times, without doubt had on board large and valuable cargoes of fish, none of which were seized, but only her fishing outfits for a new voyage. This delay, I am advised, was not from any negligence of the customs' officers, but was from their not having any information upon the subject until about the time of the vessel's seizure, which was then communicated to them by one Joseph R. McKown, who had for a number of years been in the employment of Decker the claimant, as skipper of the schooner Silver Moon, which vessel has at the present term, upon the information and procurement of said McKown, been condemned and forfeited to the United States.

Was this vessel employed in a trade, other than that for which she was licensed? I have heretofore decided, that a licensed fishing vessel does not incur forfeiture, by calling at a foreign port in the course of the fishing voyage for wood and water. I am not aware of any act of congress which forbids her so doing, or imposes on her any penalty therefor. In truth, it could hardly be thought possible, that congress would undertake to prohibit a vessel's touching at a foreign port for these articles, the very prime necessaries of life, the want, or even the contraction of the usual supply, of which, to the crew, creates the greatest distress, and if destitute of them for any considerable period of time, all on board must perish. No one ever supposed that a vessel dismasted or leaking badly was not at liberty to make and enter the nearest port for repairs, whether a domestic or foreign one. Under ordinary circumstances it is the duty of the master so to do, and it is much more his duty, thus to proceed, when the very existence of his crew may depend on obtaining forthwith these necessaries of life. In fact, there is nothing voluntary under such circumstances on his part. He is compelled by the very exigencies of his condition so to conduct, and he in so doing but yields to and obeys the law of necessity and self-preservation. Necessity knows no law, but prescribes the law.

In my opinion, it is not requisite that an imperative necessity for supplies of this description should be shown, in order to justify a fishing vessel's obtaining them at a foreign port, if they are suitable for the voyage, and the port is convenient of access, and the vessel procures only a sufficient quantity for the accomplishment of her fishing voyage. I hold that the obtaining of such supplies by her is not being engaged in another trade than that for which she is licensed. All that she has thus done is only in aid and furtherance of her legitimate business, and she is justified in doing that. This vessel was not prohibited from going into Pirate Cove for these supplies. The only purpose for which she stopped there was to procure them to aid in the completion of, and entirely as auxiliary to, the fishing voyage she was then prosecuting, and not with any design or purpose to undertake any new trade or employment. But whilst there she received on board and afterwards transported into this district two barrels, which it appears were filled with bottles of gin, although the skipper at the time was informed and supposed they contained crockery. The vessel was not detained an instant to receive these barrels on board; the business of her fishing trip was not for a moment in any way interrupted or interfered with; she did not proceed out of her regular course by reason of receiving or bringing these barrels; they were not taken for gain or profit, but merely as an act of favor and neighborly kindness exclusively from motives of friendship and good will, entirely a gratuitous service, without reward, or promise or expectation of any, in any way.

In the case of The Nymph [Case No. 10,388], the vessel was employed in the mackerel fisheries whilst licensed for cod fishing, and it was decided that she was thereby liable to forfeiture. Judge Story, had occasion to define the word "trade" as used in the 32d section of act of 1793. His opinion was that it is not there used, in a restrictive sense, as equivalent to traffic, but was the rather intended as equivalent to "occupation, employment, or business for gain or profit." Admitting this to be the proper meaning of the word in this act, the claim of forfeiture here fails at the outset, as these barrels were not transported for gain or profit, or any expectation thereof. All the cases which I have examined, where a condemnation has been had under this section, are cases, where the vessel had been employed as a carrier of merchandise in the expectation of profit, in the usual and ordinary course of navigation, and they show that a single act of trading, not within the license, is ground of forfeiture. The Active, 7 Cranch [11 U. S.] 100, was licensed for the cod fishery and received on board a cargo of provisions with intent to proceed to some foreign port. The Two Friends [Case No. 14,289] was also licensed for the cod fisheries, and was found with a cargo of flour on board, intended for a foreign voyage. The

Three Brothers [Id. 14,009] was also a fishing vessel, which went into a port on the Labrador coast, and there purchased a quantity of fish of considerable value which were brought in her to Boston.

In all of these cases, either a new voyage for profit or gain was commenced, or the prosecution of the voyage, in which the vessel was employed, was for the time being delayed and interrupted, by the purchase and reception of merchandise to be transported in the vessel for the profit and advantage of her owners. In the language of Judge Ware, in The Swallow [Case No. 13,666], in his comments on these cases: "They are all clearly cases of engaging in a trade in the usual meaning of the word, and they undoubtedly show, that a single act of trading beyond the authority of the license is fatal." The present case differs from them in many essential particulars, and bears a strong similarity to The Swallow [supra], in which it appeared that the vessel, while licensed for the fisheries, on her way to the fishing grounds touched at the Green Islands and took on board twelve or thirteen sheep and carried them to Matinicus, and when returning, she took from Matinicus four or five neat cattle and carried them to Thomaston. She did not go out of her way and was detained not more than an hour or two in the business, and it was not done for hire or profit, but was an act of good neighborhood, which fishermen were in the habit of doing for each other. Judge Ware held this vessel was not thereby made liable to forfeiture, and in his opinion, that learned judge says: "Can it in propriety of language be said, that if a small fishing vessel, employed in the coast fisheries, while on her way to or from the fishing grounds, takes a few articles of provisions or a few cattle at one place and drops them at another without being diverted from her course or occupation, and without any contract of hire or compensation or expectation of compensation, except that of a reciprocation of the same offices of good neighborhood on another occasion,—can a vessel, under such circumstances, be said to be engaged in a trade, within the meaning of the law? This would be extending the restrictions of the law further than any decision has yet carried them. I cannot think that this kind of interchange of neighborly acts falls within the words or policy of the law."

This reasoning is quite applicable to, and should control the present case. The government is not without redress for the acts of the parties concerned in this illegal importation of the gin, but I do not think the vessel and her cargo, considering fishing outfits as cargo, which question is not free from doubt, are liable to forfeiture under the circumstances here developed.

I decree a restoration of the vessel and property seized on board, and a discharge of the stipulation given in the cause; but shall certify probable cause of seizure.